## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ANTHONY MARANO COMPANY ATLANTA, LLC, | |
| Plaintiff, | |
| v. | CIVIL ACTION<br><br>FILE NO. |
| COLLINS BROTHERS CORPORATION d/b/a COLLINS BROTHERS PRODUCE; DELTA STAR CORPORATION; FUTURE MANAGEMENT CORPORATION d/b/a PHOENIX WHOLESALE FOODSERVICE; CURTIS D. COLLINS, III; WILLIAM M. COLLINS; and JOEL STEPHEN COLLINS TRUST, | |
| Defendants. | |

## COMPLAINT

Plaintiff Anthony Marano Company Atlanta, LLC ("AMC") files this Complaint against Defendants Collins Brothers Corporation d/b/a Collins Brothers Produce ("CBC"); Delta Star Corporation ("Delta Star"); Future Management Corporation d/b/a Phoenix Wholesale Foodservice ("Phoenix"); Curtis D. Collins, III; William M. Collins; and the Joel Stephen Collins Trust and alleges as follows:

140428505.3

## PARTIES

1.      AMC is a limited lability company organized under the laws of the State of Georgia. AMC has two members—Anton Marano and Damon Marano—both of whom are citizens of Illinois.

2.      Defendant CBC is a Georgia corporation with its principal place of business in Forest Park, Georgia.

3.      Defendant Delta Star is a Georgia corporation with its principal place of business in Forest Park, Georgia.

4.      Defendant Phoenix is a Georgia corporation with its principal place of business in Forest Park, Georgia.

5.      Curtis D. Collins, III is a natural person domiciled in Georgia.

6.      William M. Collins is a natural person domiciled in Georgia.

7.      The Joel Stephens Collins Trust is a trust organized under the laws of the State of Georgia, with William M. Collins as the trustee.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1332 because all the defendants are citizens of Georgia and AMC is a citizen of Illinois and the amount in controversy exceeds $75,000.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because all defendants reside in this State and district.

2

## FACTS

10.    AMC is a multi-generation, family owned, wholesale produce distributor. Started in 1947 by its namesake and his wife, the business has grown to become one of the largest produce distributors in the Midwest. AMC provides produce distribution services to retailers, such as grocery stores, as well as to food service providers, such as restaurants. AMC distributes produce under its own brand names—including Gramma Jo's, What the Fruit, and Gotcha—as well as for white-labeling by retailers.

11.    Prior to the transactions at the center of this Complaint, the defendants collectively operated a produce distribution business consisting, like AMC, of a wholesale retail produce distribution business and a food service produce distribution business.

12.    Following its successful expansion in the Midwest over the preceding decade, AMC decided to explore expansion to other regions of the country. In support of that effort, it engaged in negotiations with the defendants aimed at purchasing their businesses.

## I.    The Defendants agree to sell their business to AMC

13.    On March 1, 2024, AMC and Defendants CBC, Delta Star, Phoenix, Curtis D. Collins III, William M. Collins, and the Joel Stephen Collins Trust (the "Sellers") executed an Asset Purchase Agreement (the "APA" or "Agreement")

3

(attached as **Exhibit A**). The sale provided that AMC would pay to the Sellers a total of $17.2 million for the wholesale retail produce business they operated, approximately five times the Sellers annual earnings in that business. *See* APA § 31. That price consisted of $12.7 million to be delivered to CBC, and $1.5 million to be delivered to each of Curtis D. Collins, David M. Collins, and the Joel S. Collins Trust (the "Seller Principals"). *Id.*

14.    Pursuant to the APA, AMC would acquire the wholesale retail portion of the Sellers' business. To that end, the Sellers agreed to assign to AMC all of the inventory, equipment, vehicles, intellectual and intangible property, permits and licenses, and goodwill value relating to the wholesale retail produce business. APA § 1.1. The Sellers also agreed to assign to AMC all rights and liabilities under certain leases for real property, certain contracts related to the wholesale retail produce business, and all non-solicitation, non-competition, or other restrictive covenants related to the wholesale retail produce business. *Id.* § 2.1.

15.    In order to ensure that all such assignments were properly effected, the APA required the Sellers to disclose schedules of certain assets and liabilities. Section 1.1 of the Agreement required Sellers to disclose all the tangible assets and vehicles that would be transferred to AMC at closing. Sellers represented in Section 7.7 of the Agreement that they had disclosed all contracts, including contracts with customer rebates, related to the wholesale retail produce business:

Set forth in Schedule 2.1(b) of the Disclosure Schedule is a true, complete and correct list and description of all Contracts to which the Seller is a party relating to the wholesale retail produce business or that otherwise affect any of the Purchased Assets (including each Assigned Contract) (the "Wholesale Retail Produce Contracts"). The Seller has provided buyer with true, correct, and current copies of all such Wholesale Retail Produce Contracts. Except to the extent specifically described on Schedule 2.1(b) of the Disclosure Schedule, the Wholesale Retail Produce Contracts (and provided to Buyer) reflect the entire agreement of the parties thereto without any amendments thereto, whether written or oral, by course of dealing or otherwise . . . The Seller has paid the other party to each Wholesale Retail Produce Contract all amounts it owes them. There are no contracts that are material to the Wholesale Retail Produce Business other than the Wholesale Retail Produce Contracts.

Sellers further represented in Section 7.7(b) that there were no additional "fixed priced terms, fixed volume arrangements, 'most favored nation' arrangements, cost-plus pricing arrangements, or other pricing restrictions."

16.    Similarly, Sellers agreed to disclose all employment agreements they were party to that were related to the wholesale retail produce business, and the substantive provisions of those agreements:

Employees. Schedule 7.3. of the Disclosure Schedule lists each employee of Seller, identifies if that employee is an employee primarily involved in the wholesale retail produce business (collectively, the 'Wholesale Retail Produce Employees') or foodservice business, along with the amount of the current annual salaries or hourly wages **and a full and complete description of any commitments**. . . .

(emphasis added).

140428505.3

17.    In order to ensure that AMC was able to take over Sellers' leases, the Agreement required Sellers to "obtain[] an assignment of all leases to all buildings included in this agreement prior to the closing date."

18.    The Agreement contemplated closing by June 1, 2024, and provided AMC certain assurances about the status and operation of the business in the intervening period.

19.    Defendants in Section 5(d) of the Agreement promised the absence of any material adverse effect:

> Since the Agreement Date there shall have been no change, no event or occurrence shall have occurred, and no fact, development, circumstance or condition shall exist which has or could reasonably expected to be materially adverse to (a) the business, results of operations, condition (financial or otherwise), or prospects of the Seller's wholesale retail produce business or Purchased Assets taken as a whole, or (b) the ability of any Seller Party to consummate the transactions contemplated hereby (a "Material Adverse Effect")

20.    Further, Defendants represented and warranted that there were no material changes or detriments to the business prior to the closing date and that they would conduct the business in the ordinary and usual course between execution of the APA and the closing:

> 7.12 <u>Absence of Change</u>, Undisclosed Liabilities. Since June 20, 2023, the Seller (i) has conducted the wholesale retail produce business in the usually and ordinary course of business, consistent with past practice, (ii) **has not suffered any material adverse change in its business operations, financial condition or prospects**, and (iii) no material customer or supplier of the Seller has terminated or materially reduced its business with the wholesale retail produce business, or threatened to

140428505.3

do so following the Closing. The Seller has no material liabilities of any nature except for those liabilities set forth on the June 30, 2023 balance sheet or incurred since such date in the ordinary course of business consistent with past practice. **To the Knowledge of Seller, there are no facts which could reasonably be expected to have a Material Adverse Effect**.

\*\*\*

9.7 <u>Conduct of Business; Transition; Access Rights</u>. During the Interim Period, Seller shall (i) operate the wholesale retail produce business in the ordinary and usual course and consistent with past practice, including, without limitation, maintaining inventory consistent with the Target Inventory, and Seller shall promptly notify Buyer of action taken or occurrence that is unusual and/or not in the ordinary course of business . . . .

(emphasis added).

21.    Following closing, the Agreement required that the Sellers cease continued operations of their wholesale retail produce business:

<u>No Continued Operations</u>. Following the Closing, neither the Seller nor the Seller Parties may continue to manage, operate or continue the business of the Seller Parties involved in this Agreement. Notwithstanding the foregoing, nothing herein shall prohibit the Seller or Seller Parties from taking necessary and reasonable steps to wind up and conclude its operation of the Businesses.

It further required at closing for the Seller Principal to execute Personal Goodwill, Employment and Non-Competition Agreements. Those agreements, which the Seller Principals did execute, provided:

4.   **Non-Competition**.

(a)   Seller Principal hereby agrees that he shall not during the period commencing on the Closing Date and ending on May 31, 2026, directly or indirectly, alone or as a partner, joint venturer, officer, director, employee, consultant, independent contractor or stockholder of any company or other entity, anywhere in the United States of America, engage in a business similar to, or competitive with, Purchaser, Purchaser's affiliates or Seller, other than for Purchaser or Purchaser's affiliates. Notwithstanding the foregoing, Seller Principal shall not be deemed to have violated the prohibitions of this Section 4(a) merely due to the ownership of less than five percent (5%) of the shares of stock of any corporation having a class of equity securities actively traded on a national securities exchange or over-the-counter market.

22.     Sellers also agreed that, should they breach any representation or warranty or fail to perform or observe any covenant, agreement, or condition to be performed or observed by them under the APA, they would indemnify, defend, and hold harmless AMC from losses, damages, costs, or expenses, including attorneys' fees incurred in the pursuit of enforcing their rights under the APA.

## II.   The Defendants fail to meet their obligations in the period between execution of the APA and closing

23.     Contrary to their promise to continue the operation of the business in the ordinary and usual course and consistent with past practice, the Sellers took actions which caused material harm to the business during the period between execution of the APA and closing. The Sellers, at all times, worked together toward these harms.

24.     In Schedule 1.1(b), which listed the tangible assets and vehicles the Sellers transferred to AMC, the Sellers identified numerous trucks as "active" and in good, working condition, when they were not. The Sellers made similar representations to AMC's representatives in person during the period between the

140428505.3

execution of the APA and closing. When, after closing, AMC took control of the trucks, it learned that many of the trucks were not in good, working condition. Additionally, AMC learned that certain Seller principals, working together, had stolen certain tangible assets from the business, including tools and computer equipment. Part of that theft was caught by security camera:



25.    AMC later learned that, during the period between the execution of the APA and closing, the Seller principals specifically instructed their employees to mislead AMC's representatives regarding the status of the vehicles. The Sellers identified vehicles that were out of use due to maintenance needs by labeling them with red tags and marking them as inactive in their records. Prior to closing, but unbeknownst to AMC, Sellers instructed employees to remove red tags from trucks that were out of service, in order to mislead AMC's representatives regarding the status of the fleet. Sellers also instruction employees not to perform necessary maintenance on those trucks prior to closing.

140428505.3

26.    Sellers' refusal to perform maintenance on the truck fleet was part of a pattern of obfuscation and refusal to conduct business in the ordinary course throughout the period between the execution of the APA and closing. Sellers additionally instructed employees not to speak to AMC's representatives about the condition of the business and stole equipment and tools from business that rightly should have been transferred to AMC.

27.    Sellers also made no effort during the period between execution of the APA and closing to obtain assignments of the leases for the buildings used by them in the course of the wholesale retail produce business. Sellers held leases on part of one building (Building J) and the entirety of two other buildings (Buildings O and T) at the State Farmers Market, which they rented from the Georgia Department of Agriculture. Those leases contained favorable renewal terms capping potential increases in rent. Because Sellers failed—and did not even attempt—to obtain assignment of those leases, AMC was forced to renegotiate those leases. AMC thus lost the benefit of capped rent increases and ultimately was required to pay substantially higher rents for those leases.

## III.    After closing, AMC discovered Sellers' material non-disclosures and loss of business

28.    Only after closing, when Sellers were no longer in a position to mislead AMC and its representatives, did AMC discover that Sellers had both failed to make

140428505.3

the disclosures required by the APA and covered up material changes to the business that occurred during the period between execution of the APA and closing.

29.     Following closing, AMC discovered that pre-closing, there had been a substantial decline in the business's sales, amounting to approximately 15% of total sales and $1.6 million in annual earnings, which Sellers did not disclose.

30.     After closing, AMC also started receiving complaints and inquiries from customers who felt they were being overcharged. AMC came to learn that Sellers had failed to disclose certain rebate agreements with those customers which obligated AMC to discount those customers' purchases by tens of thousands of dollars.

31.     Additionally, AMC learned that during the period prior to closing, Sellers had failed to disclose certain outstanding liabilities of the business. Some of these liabilities were to service providers like Sellers' web hosting provider and its phone and internet providers. AMC was forced to pay the pre-closing liabilities, at substantial cost, or risk harm to its business by the loss of these services.

32.     AMC discovered that Sellers had failed to disclose that it had enforceable non-competition agreements with dozens of its employees, including sales employees who brought in substantial amounts of business.

33.     These non-competition agreements included favorable terms to the business. One representative agreement is included below:

6.     Non-Competition.  Employee agrees that during his/her employment with Company and for the period of twenty-four (24) months immediately following the termination of Employee's employment with Company for any reason (whether voluntary or involuntary or for cause or without cause), Employee shall not, directly or indirectly, compete with Company, as an officer, director, member, partner, principal, shareholder (other than a shareholder in a company that is publicly traded and so long as such ownership is less than 3 percent (3%)), owner, manager, supervisor, administrator, employee, consultant, agent, or independent contractor, by working for or engaging in a Competitive Business (as defined below) within the Territory (as defined below) in a capacity in which Employee provides services identical to or substantially similar to the services which Employee provided for Company.  For purposes of this Section, the term "**Competitive Business**" means an enterprise that is in the business of buying, selling,

2

distributing, or marketing produce and related products that are similar or identical to those offered by Company during Employee's employment with Company.  For purposes of this Section, "**Territory**" means that geographic area within a one hundred and twenty-five (125) mile air radius from Company's office location (at which Employee works) at 16 Forest Parkway in Forest Park, GA.  Employee acknowledges that Company conducts its business within the Territory, that Employee will perform services for and on behalf of Company within the Territory, and that this Section (including the time period, the scope, and the Territory) is a reasonable limitation on Employee's ability to compete with Company and that a violation hereof would constitute unfair competition.

12

This provision is taken from Sellers' employment agreement with Vernon Kelly II, [1] but is substantially the same as the other non-competition provisions. Mr. Kelly's non-competition agreement is especially relevant here. Mr. Kelly left AMC shortly after closing and took substantial business with him—at an annualized cost to AMC of over $400,0000. As a result of the non-disclosure of these agreements, AMC lost employees and business.

34.     In the months after closing, AMC began receiving information from its employees indicating that Seller principals had not ceased in the wholesale retail produce business. After investigation, AMC learned that as early as August 2024— less than three months after closing—the Seller principals has begun delivering produce to wholesale retail customers they had served prior to selling their business. Moreover, AMC learned that the Seller principals had renewed the licenses for their business entities under the Perishable Agricultural Commodities Act—licenses that would only be valuable to them if they were in the wholesale produce business. Upon

---

[1]     Although Mr. Kelly's employment agreement was nominally with the entity Coboco, LLC, Defendants did not respect the corporate form and, thus, were alter egos. Mr. Kelly's employment is, in fact, one example of the Defendants' tendency to ignore the corporate form. Although his employment agreement was nominally with Coboco, he was disclosed as an employee of CBC in the disclosure schedules required by the APA. Mr. Kelly was an employee of CBC with an undisclosed non-compete meant to protect the Seller principals at the expense of AMC.

13

information and belief, the Seller principals, through the Defendant entities and other entities, continue to engage in business competitive to AMC.

## CAUSES OF ACTION
## COUNT I: FRAUD
## (AGAINST ALL DEFENDANTS)

35.     The Defendants, through their agents and employees, knowingly made false representations to AMC regarding the status of the business and its assets, intending to induce AMC to purchase the business at higher than its fair market value.

36.     Defendants at all times worked together to effect fraud on behalf of CBC and its principals.

37.     The Defendants covered up CBC's loss of business during the period between execution of the APA and closing by instructing their employees to lie and obfuscate regarding the financial status of the business. They also intentionally failed to disclose this loss.

38.     The Defendants intentionally omitted non-competition agreements with CBC's employees, which they also intentionally and fraudulently masked as pertaining to agreements with another shell company.

39.     The Defendants, by themselves and through their agents and employees at their direction, falsely represented that trucks in their fleet were in good, working order when they were not.

140428505.3

40.    The Defendants falsely represented that they would continue their business in its normal course in the period between the execution of the APA and closing.

41.    Defendants falsely represented that they intended not to continue in the wholesale retail produce business following closing.

42.    By instituting a company-wide "gag order" directing CBC's employees not to cooperate with AMC prior to close, Defendants also purposefully withheld and did not disclose multiple business issues—amounting to misrepresentations—regarding contracts with third parties (such as rebate contracts), co-docking contracts, and the non-payment of basic service contracts.

43.    The Defendants made all these false representations with the intent that AMC would enter into the APA and close on the business for greater than the business's fair market value. AMC reasonably relied on the Defendants' misrepresentations. As a result, AMC paid more than the fair market value for Defendants' business by at least $8 million.

## COUNT II: BREACH OF CONTRACT
## (AGAINST DEFENDANTS CBC, DELTA STAR, PHOENIX, CURTIS D. COLLINS III, WILLIAM M. COLLINS, AND JOEL STEPHEN COLLINS TRUST)

44.    The APA constituted a binding contractual agreement between AMC and Sellers.

140428505.3

45.     Sellers breached the APA by falsely representing that there had been no material adverse effect on the business prior to closing. There had been a material adverse effect in the form of a substantial decrease in sales.

46.     Sellers further breached the APA by failing to maintain the business in the ordinary and normal course, including by failing to maintain their truck fleet, stealing tangible property from the business, and instructing their employees to mislead AMC's representatives.

47.     Sellers further breached the APA by failing to disclose the existence of assets or failing to assign assets that rightfully ought to have been assigned to AMC, including Sellers' rights under various non-competition agreements with Sellers' employees and Sellers' leases with the Georgia Department of Agriculture.

48.     Sellers further breached the APA by failing to disclose and pay certain liabilities that were not intended by the APA to transfer to AMC, including those incurred prior to closing to service providers and incurred under rebate agreements with customers.

## COUNT III: BREACH OF CONTRACT
## (AGAINST DEFENDANTS CURTIS D. COLLINS III, WILLIAM M. COLLINS)

49.     As required by the APA, the Seller principals each executed a Personal Employment, Goodwill, and Non-Competition agreement barring them from

16

140428505.3

competing with AMC. As recited in the APA, each received consideration in the amount of the $1.5 million for these agreements.

50.    Following closing, APA learned that the Seller principals have engaged in the wholesale retail produce business with former clients. Upon information and belief, they are providing similar services, competitive with AMC, to other customers, on an ongoing basis.

51.    These activities violate their non-competition agreement and damage AMC.

### COUNT IV: TORTIOUS INTERFERENCE IN BUSINESS RELATIONS (AGAINST DEFENDANTS CURTIS D. COLLINS III, WILLIAM M. COLLINS, AND JOEL STEPHENS COLLINS TRUST)

52.    Because Defendants previously provided AMC's clients with wholesale retail produce distribution services, the Defendants had intimate knowledge regarding AMC's relationships with those clients. The Defendants used that knowledge to interfere with AMC's relationships with those clients.

53.    Defendants knew that AMC had and intended to continue its existing relationships with those clients.

54.    Defendants interfered with AMC's relationships with those clients with the intent to harm AMC's business and drive it out of the Southeast market.

140428505.3

## PRAYER FOR RELIEF

Plaintiff Anthony Marano Company Atlanta, LLC, respectfully prays that the Court grant relief as follows:

a.    Judgment in favor of Plaintiff and against Defendants with respect to all claims alleged herein and awarding damages to Plaintiff;

b.    Judgment entered ordering Defendants to pay consequential and punitive damages and interest to Plaintiff;

c.    Judgment ordering Defendants to pay Plaintiff's attorneys fees and costs of litigation;

d.    An award of such other relief as this Court deems just and proper.

Respectfully submitted this 30th day of July, 2025.

**CARLTON FIELDS, P.A.**

*/s/ Justan C. Bounds*
Justan C. Bounds
Georgia Bar No. 339789
Dylan Magruder
Georgia Bar No. 810717
1230 Peachtree Street NE
Suite 900
Atlanta, Georgia 30309
(404) 815-3400
(404) 815-3415
jbounds@carltonfields.com
dmagruder@carltonfields.com

***Counsel for Plaintiff Anthony Marano Company Atlanta, LLC***

140428505.3